**In re William CHESLOCK, Jr. and Marlene Cheslock, Debtors.**

**MERCURY MARINE ACCEPTANCE CORPORATION, Plaintiff,**

v.

**William CHESLOCK, Jr. and Marlene Cheslock, Defendants.**

**Bankruptcy No. 92–0056–BM.
Adv. No. 92–0181–BM.**

United States Bankruptcy Court,
W.D. Pennsylvania.

Dec. 4, 1992.

Owen W. Katz, Bernstein and Bernstein, P.C., Pittsburgh, PA, for plaintiff/Mercury Marine Acceptance Corp.

William M. Panella, New Castle, PA, for defendants/debtors.

## MEMORANDUM OPINION

BERNARD MARKOVITZ, Bankruptcy Judge.

Before the court is an action brought pursuant to 11 U.S.C. § 523(a)(2), (4), and (6) to determine the dischargeability of a debt owed by debtors to Mercury Marine Acceptance Corporation ("Mercury").

Mercury asserts that the debt is not dischargeable because debtors intentionally and deliberately concealed the sale of eighteen (18) outboard marine engines "out of trust" in order to avoid having to pay Mercury for them, as was required by a security agreement.

Debtors maintain that the debt is dischargeable because Mercury was aware of and had ratified their actions.

The debt of $34,580.10 owed by debtors to Mercury is not dischargeable for reasons set forth below.

--I--

### FACTS

On September 24, 1983, 422 Marine, Inc. entered into a security agreement with Finance America Private Brands, Inc., predecessor-in-interest to Mercury. The security agreement was executed on behalf of 422 Marine, Inc. by debtor William Cheslock in his capacity as President. Debtor Marlene Cheslock, the wife of William Cheslock, affixed her signature to the agreement as Secretary of 422 Marine, Inc. certifying that the agreement had been duly authorized by its board of directors.

422 Marine, Inc., which is in the business of selling marine engines, parts, and accessories, was never incorporated. Rather, it

operated as a partnership of which both debtors were the only principals.

The security agreement granted Finance America a security interest in certain inventory, including Mariner, Mercruiser, and Quicksilver marine engines, and in parts and accessories acquired from Mariner Outboards. The security interest was duly perfected in accordance with Pennsylvania law.

The security agreement provided that payments were to be made in accordance with statements submitted by Mercury and "in any event upon the sale or other disposition by the Dealer of any items of inventory (unless otherwise agreed to by Secured Party)". It further provided that the secured party could enter the dealer's premises to conduct reasonable inventory inspections.

The agreement between Mercury and 422 Marine amounted to a floor plan financing arrangement. Mercury financed the purchase of marine engines for which 422 Marine was obligated to pay as it sold them.

Not all of the engines subject to the security agreement were kept in the showroom of 422 Marine. A few were on display in the showroom. The majority were stored in their original cartons several miles from the showroom in a garage adjacent to debtors' private residence.

Pursuant to the terms of the security agreement, Mercury conducted monthly inspections to determine whether any engines which were subject to its security interest had been sold during the preceding month.

The person conducting the inspection on behalf of Mercury utilized a pre-printed checklist. Each engine subject to the security interest was identified by manufacturer's name, unit name, model number, serial number, and the amount due. The person conducting the inspection indicated on the checklist whether a given engine had been sold, was on display in the showroom, or was still in its original carton.

The person conducting the inspection would not look inside cartons to determine whether they were empty if the plastic bands on the outside of the carton looked to be intact and the carton did not appear to have been opened.

The cartons kept in debtors' garage were stored in a corner behind a pile of debris. The checker was never permitted to enter the garage unless accompanied by one of the debtors, who discouraged the checker from climbing over the debris in front of the boxes. They instead "volunteered" to climb over it themselves and to read out the information on the cartons which was required for the inspection.

The checklist was signed and dated by the checker upon completion of the inspection. One of the debtors, depending on which of them had accompanied the checker to the garage, also signed the checklist.

An inspection was conducted by Mercury on April 9, 1990. The checklist indicated that six (6) units were on display in the showroom, and that twenty-one (21) units were still in their cartons. Debtor Marlene Cheslock signed the checklist.

The information on the checklist was incorrect. Eighteen (18) of the twenty-one (21) cartons in fact were empty. Starting in February of 1986, debtors had surreptitiously removed engines from their cartons and had sold them to customers. The cartons nonetheless were stacked in debtor's garage to convey the impression that they still contained the engines. Debtors never remitted payment to Mercury for any of these engines, as was required under the security agreement.

Another inspection was conducted on May 9, 1990. The checklist, which debtor Marlene Cheslock signed, indicated that two (2) of the six (6) engines listed on the previous month's checklist as being on display in the showroom had been sold. The checklist further indicated that four (4) engines still were on display in the showroom and that the remaining twenty-one (21) engines still were in their cartons in debtors' garage.

The checklist compiled on June 7, 1990, which debtor William Cheslock signed, indicated no change in the status of the inventory subject to Mercury's security interest.

The checklist compiled on July 31, 1990, indicated that another unit on display in the showroom had been sold. It indicated that three (3) engines had been sold, that three (3) engines were on display in the show-room, and that twenty-one (21) engines still were in their original cartons in debtors' garage. Debtor Marlene Cheslock signed the checklist.

Despite their repeated promises to do so, debtors failed to remit payment for the three (3) engines which the above checklists indicated they had sold. On August 21, 1990, Mercury brought a replevin action in state court against 422 Marine and both debtors. Mercury sought to replevin twenty-one (21) engines in accordance with the information contained on the above checklists.

Additional monthly checklists were compiled between August of 1990 and January of 1991. They indicated no change in the status of the inventory subject to Mercury's security interest.

On December 5, 1990, 422 Marine and debtors executed a stipulation of settlement of Mercury's replevin action. Debtors acknowledged that they were indebted to Mercury in the amount of $40,626.86 plus interest; that $25,609.73 of said amount was "owed on account of in stock units"; that $5,244.31 was "owed on account of items sold out of trust"; that $591.11 was owed on account of an NSF check; and that the remainder was for other amounts due under the security agreement.

The settlement agreement recited that debtors were "desirous of remaining in possession of the subject collateral pending payment to Plaintiff [i.e., Mercury] of the above monies".

A schedule of payments whereby debtors were to pay the entire amount due by February 1, 1991 was set forth in the agreement. Although debtors did make payments totalling $11,000.00, thereby reducing their total indebtedness to Mercury to $29,628.86, they eventually defaulted by failing to make certain payments in accordance with the stipulation.

Mercury responded by obtaining a writ of possession for the twenty-four (24) engines presumably still in debtors' possession. The sheriff served the writ upon debtors on April 5, 1991. The person who had compiled the aforementioned checklists since April of 1990 accompanied the Sheriff. Only six (6) engines were recovered. Three (3) engines were recovered from the showroom. Three (3) engines were recovered from debtors' garage. As has been noted, debtors surreptitiously had begun selling these engines in February of 1986.

On May 21, 1991, a rule to show cause why monetary damages should not be fixed in the amount of the remaining deficiency was obtained by Mercury in state court. Mercury sought damages in the amount of $41,816.01. Debtors denied in their answer to the rule that the amount of the deficiency was $41,816.01 but admitted instead that the amount was $34,590.10. Judgment subsequently was entered against 422 Marine and against debtors in the amount of $34,580.10 plus interest from June 1, 1991 and costs.

Debtors filed a joint, voluntary chapter 7 petition on January 6, 1992. Schedule D, Creditors Holding Secured Claims, listed a secured debt in the amount of $34,580.10 owed to Mercury. On February 19, 1992, Mercury filed a proof of claim in the amount of $35,919.93 based on the judgment entered on June 1, 1991.

On April 9, 1992, Mercury filed the complaint objecting to dischargeability of debt which is now before the court. Trial was held on October 28, 1992, at which time Mercury and debtors were permitted to offer any evidence they considered appropriate.

–II–

ANALYSIS

Mercury asserts that the above debt owed to it by debtors is nondischargeable pursuant to 11 U.S.C. §§ 523(a)(2), (4), and (6).

Debtors insist that the debt is dischargeable. According to debtors, Mercury was aware that they had sold engines "out of

trust" and had ratified their conduct with respect to the eighteen (18) empty cartons in their garage. They submitted that a representative of Mercury, upon learning that debtors were having difficulty paying for engines they had sold, advised them to keep the empty boxes in storage and to say nothing about the sale of the engines until they could pay for them.

■ The debt of $34,850.10 owed by debtors to Mercury is *not* dischargeable.

11 U.S.C. § 523(a)(6) provides as follows:
(a) A discharge under section 727 of this title does not discharge an individual debtor from any debt....
  (6) for willful and malicious injury by the debtor to another entity or to the property of another entity.

■ A party objecting to dischargeability of a debt pursuant to 11 U.S.C. § 523(a)(6) has the burden of proving:
  (1) that debtor's conduct was willful;
  (2) that debtor's conduct was malicious;
  (3) that the party objecting to dischargeability suffered injury; and
  (4) that the injury suffered was proximately caused by debtor's conduct.
*See In re Vorek,* 95 B.R. 599, 603 (Bankr. S.D.Ind.1983). Each of these elements must be established by a preponderance of the evidence. *See In re Braen,* 900 F.2d 621, 624–26 (3d Cir.1990) (*cert. denied sub nom. Braen v. Laganella,* — U.S. —, 111 S.Ct. 782, 112 L.Ed.2d 845 (1991)).

[3, 4] Conduct is "willful" for purposes of § 523(a)(6) if it is deliberate or intentional. *See In re Galizia,* 108 B.R. 63, 69 (Bankr.W.D.Pa.1989). Conduct is "malicious" when it is without just cause or excuse. *Id.* Specific intent to cause harm to another entity[1] or to their property is not required. *See In re Keller,* 106 B.R. 639, 641 (9th Cir. BAP 1989).

Each of the above required elements has been established in this case by a preponderance of the evidence.

Debtors' conduct in removing the engines from their cartons and selling them without paying for them was intentional, not accidental or inadvertent. Moreover, they actively undertook to conceal their actions from Mercury. Debtors repositioned the bands around the cartons, stored them behind debris in their garage, discouraged the checker from climbing over the debris to inspect the cartons, "volunteered" to climb over the debris and to read off the serial numbers on the cartons, and signed several checklists certifying their accuracy when they obviously knew they were inaccurate.

Debtors' conduct was also malicious—i.e., without just cause or excuse. Their attempt to justify their conduct must be rejected. According to debtors, a factory representative of Mercury advised them early in 1986 upon learning of their financial woes that they could sell the engines and maintain the cartons in which they had been delivered as though they still contained engines until they could make payment.

The court has had an opportunity to observe debtors' demeanor and finds their testimony to this effect to be not credible. No such "advice" was ever given. To the contrary, the course of action undertaken by debtors was conceived and devised by them without the assistance of anyone else.

■ Moreover, even if such advice had been given, it would *not* have justified or excused debtors' conduct. According to debtors, the individual who purportedly so advised them was a *factory representative* of Mercury—i.e., of the entity that *manufactured and supplied* the engines.

Plaintiff in this action—i.e., Mercury Marine Acceptance Corporation—financed debtors' purchase of the engines. It is *not* the entity that manufactured and/or supplied the engines to debtors. The individual who purportedly so advised debtors was *not* an agent or employee of plaintiff in this action and had no authority, actual or apparent, to bind plaintiff by his words or

**1.** "Entity" includes persons. *See* 11 U.S.C. § 101(15). "Person" in turn includes corpora-

tions. *See* 11 U.S.C. § 101(41).

deeds. Such advice, if indeed it was given, was not given on behalf of plaintiff. Even if their story were to be believed, debtors knew they were not acting with the approval of plaintiff in this action.

Finally, it is beyond peradventure that Mercury was injured as a proximate result of debtors' actions. The money received by debtors from the surreptitious sale of the engines was used by them for other purposes and was never remitted to Mercury. Plaintiff has not been paid for the engines.

The debt in the amount of $34,580.10 arising out of the judgment entered against debtors in state court and which is reflected in their bankruptcy schedules is nondischargeable pursuant to 11 U.S.C. § 523(a)(6). It is not necessary in light of this determination to consider whether the debt also is nondischargeable pursuant to 11 U.S.C. §§ 523(a)(2) and (4).